# EXHIBIT B

EXHIBIT

2

exhibitsticker.com

# FORCE ANALYSIS

Name of Victim: Ariel Roman
Department involved: Chicago Police Department
Date of incident: February 28, 2020
Time of incident: Approx. 4:10 pm
Location: CTA Red Line station at Grand & State

William M. Harmening
09/21/2022

## STATEMENT OF QUALIFICATION

My qualifications for providing expert witness testimony in the area of police practices and use of force derive from two sources, one occupational, and the other academic. I have been a law enforcement officer for approximately 36 years, both in a patrol and investigative capacity. I am a graduate of the Illinois State Police Academy (1982), and from 2001 to my retirement in September 2018, served in the capacity of Chief Special Agent for the Illinois Securities Department. I am a former police academy instructor in Illinois and was responsible for all behavioral science instruction to Illinois police cadets completing their initial basic training. This instruction included the psychology of force, especially deadly force. Additionally, I was a member of the Central Illinois Critical Debriefing Team and became a member after my own officer-involved shooting.

Over the course of my law enforcement career I have attended many different types of training, including investigative methods, violent and property crimes investigation, and crime scene processing and analysis. My investigative methods training included techniques related to trajectory analysis, blood stain analysis, and crime scene analysis, among others. I later became a police academy instructor in crime scene processing and analysis. I was also one of the first fifteen officers in the State of Illinois to receive C.I.T. training ("crisis intervention team"). Those of us who received this training were trained as trainers. Additionally, I have qualified annually with my duty weapon, and have periodically attended law updates on the use of force. I have also participated in many different types of police training as an instructor or co-instructor, and routinely teach in an academic setting on the subject of force, particularly the psychology of force. This instruction is evidence-based using peer-reviewed research.

In terms of academic qualifications, until my retirement from teaching in Spring '19, I served as the program coordinator of the Forensic Psychology certificate program at Washington University in St. Louis, one of the Nation's top research universities. In this capacity I also served as lead instructor for the following courses:

- Introduction to Forensic Psychology (includes a comprehensive treatment of the use of force by the police)
- Crisis Intervention (includes a comprehensive treatment of the use of force by the police).
- Criminology
- Correctional Psychology
- Investigative Psychology

Two of these courses, Introduction to Forensic Psychology and Crisis Intervention, deal extensively with the subject of police use of force. Additionally, I have authored four peer-reviewed textbooks Additionally, I have authored four peer-reviewed textbooks and a non-peer reviewed mass market book, as follows:

- The Deadly Force Script: How the Police in America Defend the use of Excessive Force (2021, ABA Publishing).
- Forensic Psychology (2015, Pearson Publishing). This widely used textbook includes an extensive treatment of the subject of force using the most current research.
- Crisis Intervention: The Criminal Justice Response to Mayhem, Chaos, and Disorder (2014, Prentice Hall). Also includes an extensive treatment of the subject of force.
- Serial Killers: The Psychosocial Development of Humanity's Worst Offenders (2014, Charles C. Thomas).
- The Criminal Triad: Psychosocial Development of the Criminal Personality Type (2010, Charles C. Thomas).

I have reviewed and/or investigated approximately 250 police use-of-force cases, and have testified in the following depositions and trials during the previous four years:

- Deposition (04/17) – Estate of Dontre Hamilton v. City of Milwaukee, Federal District Court, Eastern Division of Wisconsin, 16-CV-507.

- Deposition (8/17) – Estate of Darren Billy Wilson v. Bartow County GA, Federal District Court, Northern District of Georgia, 4:17-CV-00018.
- Deposition (12/17) – Estate of Nicholas Dyksma v. Harris County GA, Federal District Court, Southern District of Georgia.
- Deposition (05/18) – Estate of Javier Gaona v. City of Santa Maria CA, Federal District Court, Central District of California, no. 217-CV-01983.
- Deposition (5/18) – Estate of Rafael Cruz v. City of Chicago IL, Circuit Court of Cook County, no. 16 L 00823.
- Deposition (7/18) – Estate of Nicholas Thomas v. City of Smyrna GA, Federal District Court, Northern District of GA, 1:17-CV-01036.
- Deposition (7/18) – Estate of Destry Meikle v. City of Republic MO, Federal District Court, Western District of Missouri, 6:17-CV-3194-DPR.
- Deposition (7/18) – Estate of Jason Fanning v. City of St. Joseph MO, Federal District Court, Western District of Missouri, 17-06073-CV-SJ-SWH.
- Deposition (8/18) – Estate of Jason Alderman v. City of Bakersfield CA, Federal District Court, Eastern District of California, 1:16-CV-00994-DAD-JLT.
- Deposition (09/18) – Estate of Miguel Gonzales v. Bernalillo County NM, Federal District Court, District of New Mexico, 18-CV-00125-KG-LF.
- Deposition (09/18) – Gerald Cole v. City of Indianapolis, Federal District Court, Southern District of Indiana, 1:16-cv-03081-WTL-MJD.
- Deposition (10/18) – Matthew Schantz v. Appling County GA, Federal District Court, Southern District of Georgia, 2:17-cv-157.
- Deposition (10/18) – Estate of Aaron Siler v. City of Kenosha WI, Federal District Court, Eastern District of Wisconsin, 2:17-CV-01324-DEJ.
- Deposition (11/18) – Estate of Donte Johnson v. City of Dolton IL, Federal District Court, Northern District of Illinois, 17-CV-2888.
- Deposition (12/18) – Estate of Lori Knowles v. Henry County GA, Federal District Court, Northern District of Georgia, 1:18-CV-01394-TWT.

- Deposition (01/19) – Antwon Golatte v. City of Chicago IL, Federal District Court, Northern District of Illinois, 17-CV-00929.
- Deposition (01/19) – Estate of Andre Green v. City of Indianapolis IN, Federal District Court, Southern District of Indiana, 1:17-CV-02673-JPH-TAB.
- Deposition (01/19) – Estate of Casimero Casillas v. City of Fresno CA, Federal District Court, Eastern District of California, 1:16-CV-1042-AWI-SAB.
- TRIAL (03/19) Estate of Casimero Casillas v. City of Fresno CA, Federal District Court, Eastern District of California, 1:16-CV-1042-AWI-SAB.
- Deposition (3/19) – Estate of Tommy Le v. King County WA Sheriff's Dept., Federal District Court, Western District of Washington, 2:18-CV-00055-TSZ.
- Deposition (4/19) – Estate of Donnie Robertson v. Corporal C.J. Deitz, Federal District Court, Western Division of Virginia, 5:18-CV-00067-EKD.
- TRIAL (05/19) - Estate of Dontre Johnson v. City of Dolton IL, Federal District Court, Northern District of Illinois, 17-CV-2888.
- Deposition (07/19) – Wuenschel et al. v. Columbus GA, Federal District Court, Middle District of Georgia, 4:18-CV-220-CDL.
- Deposition (07/19) – Estate of Jacai Colsen v. Prince George's County MD, Circuit Court of Prince George's County, CAL-18-19598.
- Deposition (09/19) – Estate of Donald Sneed v. Jackson County MO, Circuit Court of Jackson County, 1816-CV-25106.
- Deposition (09/19) – Estate of Hector Arreola v. City of Columbus GA, Federal District Court, Middle District of Georgia, 4:19-CV-00005-CDL.
- Deposition (10/19) – Deliah Hampton v. San Joaquin County CA, Federal District Court, Eastern Division of California, 2:16-CV-01816-MCE-AC.
- Deposition (10/19) – Tina Boyer v. Pulaski County KY, Federal District Court, Eastern District of Kentucky, 6:18-CV-00090-DLB-HLI.
- Deposition (10/19) – Estate of Anthony Soderberg v. Los Angeles CA, Federal District court, Central District of California, CV18-03861 FMO (JPRx).

- Deposition (11/19) – Jason Sears v. Pulaski County KY, Federal District Court, Eastern District of KY, 6:18-CV-00234-REW-HAI.
- Deposition (12/19) – Kristine Hendrix v. City of St. Louis MO, Missouri Circuit Court, 1722-CC01430.
- Deposition (12/19) – Demontel Hendricks v. City of Griffith IN, Federal District Court, Northern District of Indiana, 1:17-CV-412-RL-JEM.
- Deposition (12/19) – Estate of Mario Guevara v. City of Colton CA, Federal District Court, Central District of California, 5:18-CV-02386-RGK (SPx).
- Deposition (06/20) – Estate of Isaiah Murrietta-Golding v. City of Fresno CA, Eastern District of California, 1:18-CV-00314-AWI SKO.
- Deposition (08/20) - Estate of Eric Logan v. South Bend IN, Federal District court, Northern district of IN, 3:19-CV-495.
- Deposition (10/20) – Estate of Ricky Starks v. Los Angeles County, Superior Court of the State of California, Central District, 19STCV38462
- Deposition (11/20) – Estate of Reuban Galindo v. City of Charlotte N.C. et al., Federal District Court, Western District of NC, 3:19-CV-491-RJC-DCK.*
- Deposition (12/20) – Rivera v. City of Chicago, Circuit Court of Cook County, 19 L 2076.
- Deposition (02/21) – Estate of Giovann McDade v. Kent WA, Federal District Court, Western District of Washington, 2:20-771-BJR.
- Deposition (02/21) – Walker Jr. vs. Sandersonville GA
- PROBABLE CAUSE HEARING (02/21) – State of Wisconsin vs. Joseph Mensah, Milwaukee County WI.
- PROBABLE CAUSE HEARING (03/21) – State of Wisconsin vs. Joseph Mensah, Milwaukee County WI.
- Deposition (05/21) – Estate of Adam English vs. Gainesville GA.
- PRELIMINARY HEARING (06/21) – State of California vs. Ari Gold, Monterey County CA
- PRELIMINARY HEARING (10/21) – State of California vs. Ari Gold, Monterey County CA.
- TRIAL (10/21) – Estate of Kenneth French vs. City of Los Angeles, Federal District Court, Central District of CA, 5:20-cv-00416-JGB-SP.

- Deposition (11/21) – Lewis vs. G4S Security, St. Louis County Circuit Court.
- Deposition (11/21) - Mitchell vs. Scott County IA, Iowa District Court, LACE 133201.
- TRIAL (12/21) – Rice vs. City of Roy WA, Federal District Court, Tacoma WA, 20-5223 RJB
- Deposition (12/21) – Zappier vs. Hamblen County TN, Federal District Court, Eastern District of TN, 2:20-CV-221.
- Deposition (01/22) – Dold vs. Snohomish County WA, Federal District Court, Western District of Washington, 2-20-CV-00383-RAJ.
- Deposition (02/22) – Williams vs. City of Albany NY, Federal District Court, Northern District of NY, 1:18-CV-1446 (LEK/DJS).
- Deposition (02/22) – Granton vs. City of Chicago, Cook County Circuit Court, 18 L 8034.
- Deposition (06/22) – Little vs. Morristown TN et al., Federal District Court, Eastern District of Tennessee, 2:21-cv-00047.
- Deposition (06/22) – Ball-Bey vs. City of St. Louis MO, Federal District Court, Eastern District of Missouri, 4:18-cv-01364.
- Deposition (06/22) – Salyers vs. Tacoma WA, Superior Court of the State of Washington, 21-2-07268-4.
- Deposition (06/22) – Easterly vs. Knox County TN.
- Deposition (06/22) – Hopkins vs. City of Schenectady NY, Federal District Court, Northern District of New York, 1:20-cv-0618 (TJM/CFH).

The report that follows was completed using the following:

All CTA security video from Grand & State

Michael McDunnah video

Butler/ Roman/ McDunnah deposition transcripts

CPD Investigative file/ report

Bogard and Butler Taser data reports

CPD General/ Special Orders

Materials cited

My fees for this service are $150 hr. for drafting the report, and $200 hr. for deposition or trial testimony.

## INTRODUCTION

On February 28, 2020, at approximately 4:10 pm, Officers Bernard Butler and Melvina Bogard were patrolling the CTA Red Line when they observed a male, later identified as Ariel Roman, cross into their car from an adjoining car, a CTA ordinance violation. The officers stopped Roman and escorted him from the train at the next stop (Grand and State). Roman advised the officers that he changed cars because someone was bothering him. According to Officer Butler, once off the train, their intent was to issue Roman a citation for the ordinance violation. While on the platform—this part of the incident was captured by one of the CTA security cameras—Roman was asked for his ID. Shortly after, he is seen reaching toward his backpack. The officers immediately grabbed his hand and prevented him from doing so. Roman can be seen pulling his arm away and a struggle ensued. During this struggle, which was captured by multiple CTA security cameras and a citizen cell phone camera (Michael McDunnah), the officers deployed their Tasers, after which Bogard deployed her O.C. spray and then her firearm, shooting Roman twice, once in the chest while at the bottom of the escalator, and then in the buttocks while Roman was on the escalator and near the top. Roman survived the shooting.

The purpose of the analysis and report to follow is to reach an informed opinion about the appropriateness of the officers' actions in the context of accepted police training, standards of practice, and CPD policy. The analysis will look at the officers' decision to physically restrain Roman; to deploy their Tasers; the extent to which they either attempted or failed to attempt de-escalation; and finally, Officer Bogard's decision to use deadly force.

## INITIAL CONTACT

After the officers had escorted Roman from the train at the Grand and State stop, they advised him they would be issuing a notice of ordinance violation citation ("ANOV") for walking between the train cars. In his deposition of May 27, 2022, Roman disputes this, and testified that the officers, specifically Butler, was asking him why he walked between the train cars. The issuance

of an ANOV is a non-custodial arrest and amounts to the issuance of a ticket indicating a date to appear before an administrative court judge unless the stated fine is paid before then. Once the ticket is issued, the arrestee is allowed to leave without having to post a bond. CPD policy stipulates certain situations in which a ANOV will not be issued, and the subject will instead be physically arrested.[1] Two issues are important here:

1. The CPD policy directs that a person who will not or cannot provide an ID will be physically arrested (II.B.2). There is no evidence in this case that Roman refused or was unable to provide an ID. In fact, the video is clear that while Roman may have demanded to know why he was being cited, he did attempt without delay to comply by reaching into his backpack to retrieve his wallet and ID.

2. Even if the subject exhibits behavior that requires the officer to use physical force to overcome passive resistance or to handcuff the subject, and the force caused no physical injury or led to an allegation of injury, then the ANOV will still be issued (II.B.3). In this case, Butler gave conflicting accounts for why he grabbed Roman's arm. In his post-incident interview with Det. Katz, Butler stated that he grabbed Roman because Roman was putting his hands in his backpack, and that he then decided to physically arrest Roman because he was reaching for his waistband.[2] First of all, there is no evidence at all that Roman reached for his waistband. Regarding the backpack, at no time did Roman reach in a manner that indicated anything other than his attempt to immediately comply with Butler's request for an ID. In fact, his hands never even made it to the backpack. Even though Roman pulled away, under the CPD policy, it did not preclude Butler from still issuing the ANOV citation and avoiding a physical arrest. A reasonable officer would have let go, thus immediately de-escalating the situation, and then instructed Roman not to reach in the backpack. Commands could have then been given to retrieve the ID in a more controlled manner.

[1] CPD special order S04-22-01 "Exemptions and Restrictions for Issuing ANOV Citations."
[2] See CPD investigative report, page 22 of 28.

During Butler's deposition, his reasons for grabbing Roman changed. He testified that he grabbed Roman's arm because Roman was reaching into his backpack, and then continued to struggle with him in an attempt to pull him away from the tracks, presumably for his own safety.[3] He no longer included the waistband defense in his testimony. But this leads to the question, if his intent was to pull him away from the tracks, why didn't he simply let go of Roman once they moved away? He really provides no sufficient reason in his deposition for physically arresting Roman. While it may have been acceptable for Butler and Bogard to grab Roman's arm and prevent him from reaching into his backpack, notwithstanding the fact that Roman was doing exactly what they asked him to do, any continued use of physical force once Roman pulled his arm away was inappropriate. Roman was not under custodial arrest, the act of pulling his arm away did not demand a custodial arrest under CPD policy, and the only reason he was close to the tracks was because the two officers were keeping him there. When the officers should have attempted to de-escalate the situation after Roman pulled away, they instead dangerously and recklessly escalated the situation by attempting to subdue and handcuff Roman in close proximity to the train tracks and numerous commuters.

**OPINION NO. 1: In the context of accepted police training and CPD policy, the decision by Officers Butler and Bogard to subdue and handcuff Roman rather than attempt to de-escalate the situation, and to do so at a time when no custodial arrest was demanded, was inappropriate and excessive under the circumstances and led directly to the eventual use of deadly force by Bogard.**

TASER DEPLOYMENT

The Taser is a defensive weapon that represents an intermediate level of force. It is not to be used for compliance but for defense of self or others from an active threat. There was a total of five Taser deployments (trigger pulls) against Roman—two by Bogard and three by Butler. Bogard

[3] Butler deposition, beginning at 52:20.

fired both of her cartridges within two seconds of each other while standing and hanging on to Roman. Neither appeared to have any effect. At this time, as seen on the McDunnah video, Roman was pulling away but was neither assaulting nor threatening the officers. In fact, when Bogard deployed her Taser, the officers had Roman's hoodie pulled over his head and face while they struggled to take him to the ground. Approximately one minute later, Butler deployed both of his cartridges in rapid succession, followed by an additional trigger pull five seconds later. All of Butler's deployments were while he and Roman were on the ground. Again, at no time is Roman seen on the McDunnah video assaulting or threatening to assault either officer. In the context of CPD policy guiding the use of the Taser (General Order G03-02-04), the following issues are noted:

1. The policy defines as "active resistant," as an individual who attempts to create distance between themselves and the officer to avoid physical control and/or arrest.[4] While it may be argued that Roman was actively resistant, the policy limits the use of Tasers against such an individual to the following situations:

    a. A subject that is armed.
    b. A subject that is violent or exhibiting violent or aggressive behavior.
    c. A subject that has committed a felony.
    d. A subject that has committed a misdemeanor offense that is not property-related, a quality-of-life offense, or a petty municipal code or traffic offense.

    In this case, Roman was clearly not aggressive or violent toward the officers. At no time during the encounter did he assault or threaten to assault either officer. And given that his crime was only a municipal code violation, it was inappropriate and a violation of policy for Bogard and Butler to deploy their Tasers when they did.

[4] CPD General Order 03-02-01 "Response to Resistance and Force Options."

2. The CPD policy requires that officers attempt de-escalation to avoid using force.[5] Prior to deploying their Tasers the officers had multiple opportunities to simply let go of Roman, block his ability to leave, and attempt to talk to him. Doing so initially, or even at the point Bogard deployed her Taser would not have precluded them from still issuing the ANOV and allowing Roman to leave. There was no apparent effort to de-escalate once the officers grabbed Roman.

3. Neither officer used their Taser in a manner consistent with their training and in a way that would do other than escalate the situation and increase the probability of a greater level of force being used. Both officers were much too close (both fired from within inches of Roman) for the Tasers to have any effectiveness and achieve neuromuscular incapacitation ("NMI"). At best, they had the effectiveness of a "drive stun." The use of a drive stun is now prohibited by CPD policy unless the subject meets the criteria for an "assailant,"[6] and has always been advised against using by Axon, Inc., the manufacturer of the Taser. The problem is a suspect will easily repel away from a drive stun and only escalate their efforts to escape its use.

**Opinion no. 2: In the context of accepted police Taser training and CPD policies, the use and manner in which Officers Bogard and Butler deployed their Tasers was inappropriate and excessive under the circumstances and only increased the likelihood that either or both officers would escalate their level of force unnecessarily.**

USE OF DEADLY FORCE

Police officers are trained to know understand that deadly force can only be used in response to an imminent threat of death or serious injury. They are also trained to know and understand the "imminent" means that threat is more likely than not to be carried out unless immediate action

[5] CPD General Order 03-02-04(II.B) "Taser Use Incidents."
[6] CPD General Order 03-02-04 (II.D.5)

is taken to prevent it. These requirements and definitions are clearly stated in the CPD use of force policy (General Order 03-02).

Officer Bogard fired her handgun twice. The first shot was captured by witness McDunnah. The second shot was captured by the CTA security camera at the top of the escalator. Regarding the first shot, clearly there was no imminent threat at the time Bogard fired. Roman was able to get to his feet after the struggle with Butler on the ground and after being shot in the face with O.C. spray by Bogard. His behavior to this point was defensive and involved no assault or threat of assault to the officers. As he stood up—again, making no effort to assault either officer—Bogard can be seen and heard reaching for her firearm and saying, "I'm going to shoot him"[7]. In response, Butler let go of his grip on Roman and yelled "shoot him!" Bogard fired once, striking Roman in the chest. Roman did not go down but instead proceeded up the escalator. The officers followed and as Roman was stepping off at the top, Bogard fired a second time, striking Roman in the buttocks. This time he fell to the ground.

This case represents an egregious misuse of deadly force. At no time did Roman present an imminent threat of violence toward the officers. At the time of the first shot he was arguably still blinded by the O.C. spray. And at the time of the second shot, he was 10-20 feet ahead of the officers attempting to leave by the escalator. By the time Bogard deployed her firearm, the officers had missed multiple opportunities to de-escalate the situation. A further consideration that should have affected Bogard's decision to fire her weapon was the fact that they were in a busy train terminal with people all around them. Her decision to fire her weapon was not only inappropriate and excessive under the circumstances, but also very reckless.

**OPINION NO. 3: In the context of accepted police training and CPD policy, Officer Bogard's use of deadly force against Ariel Roman was inappropriate and excessive under the circumstances.**

---

[7] At 03:53 in the full McDunnah video.

CONCLUSION AND OPINIONS

The shooting of Ariel Roman was unnecessary and easily avoidable. Butler and Bogard crossed a line when they grabbed Roman as he attempted to comply with their request for an ID, and when Roman pulled away, instead of immediately attempting to de-escalate the situation, the officers began a gradual escalation of force that culminated in Bogard shooting Roman twice at a time when he exhibited absolutely no threat at all to the officers or anyone else. Bogard's inability to physically restrain Roman, or even to assist Butler, resulted in her inappropriate use of her Taser, then the reckless use of her O.C. spray next to Butler's face, and finally, to her egregiously inappropriate and excessive use of deadly force. She demonstrated neither the judgement nor the physical ability to deal with the situation; deficits that caused a minor ordinance infraction to unnecessarily spiral out of control and devolve into a matter of life and death.

My opinions in this matter are again as follows:

**OPINION NO. 1: In the context of accepted police training and CPD policy, the decision by Officers Butler and Bogard to subdue and handcuff Roman rather than attempt to de-escalate the situation, and to do so at a time when no custodial arrest was demanded, was inappropriate and excessive under the circumstances and led directly to the eventual use of deadly force by Bogard.**

**Opinion no. 2: In the context of accepted police Taser training and CPD policies, the use and manner in which Officers Bogard and Butler deployed their Tasers was inappropriate and excessive under the circumstances and only increased the likelihood that either or both officers would escalate their level of force unnecessarily.**

**OPINION NO. 3: In the context of accepted police training and CPD policy, Officer Bogard's use of deadly force against Ariel Roman was inappropriate and excessive under the circumstances.**